Argued and submitted January 12, reversed and remanded July 7, petition for review denied October 26, 1999 (329 Or 447)

Harley C. ROBERTS, Jr.,
Successor Trustee of the C.A. Dillinger Residual Trust,
*Respondent,*

*v.*

Dennis R. MAZE
and Beatrice U. Maze,
*Appellants.*

(9706-04247; CA A101786)

985 P2d 211

Derek C. Anderson argued the cause for appellants. On the briefs were Mark McCulloch and Powers, McCulloch & Bennett, LLP.

Kevin O'Connell argued the cause for respondent. With him on the brief was Kevin O'Connell, P.C.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

HASELTON, J.

## HASELTON, J.

Defendants appeal, assigning error to the allowance of plaintiff's motion for summary judgment in an action to enforce and collect on a promissory note. Defendants contend, particularly, that the trial court erred in concluding that the parol evidence rule, ORS 41.740, precluded its consideration of evidence that the promissory note was, in fact, a sham. We conclude that the trial court so erred and, consequently, reverse and remand.

On October 4, 1994, defendants executed a promissory note in the principal amount of $52,958.66, with interest of eight percent per annum, in favor of the C.A. Dillinger Residual Trust. The note required payment by July 4, 1995, but defendants failed to make any payment on the note. In June 1997, plaintiff, as trustee, brought this action to collect on the promissory note. Defendants answered, denying, *inter alia*, that the note was given "for good and valuable consideration," that they had promised to make payment on the note, or that they were in default for nonpayment. Defendants also raised affirmative defenses of "no consideration" and "failure of consideration," in which they alleged:

"9.

"On or about August 5, 1993, the Mazes entered into a promissory note with the plaintiff for the principal sum of $75,000, together with interest thereon at the rate of nine percent (9%) per annum, payable ninety (90) days after the date of execution of the note (the 'Primary Note').

"10.

"On or about January 4, 1994, the Mazes tendered payment in the amount of $77,773.95 to the trustee of the C.A. Dillinger Residual Trust, Hillary [*sic*] Turner ('Prior Trustee').

"11.

"The Prior Trustee directed that the Mazes' payment be divided into two checks: (1) for $27,773.95 made payable to the Trust, and (2) for $50,000 made payable to KEERIN

Systems. The Mazes complied with the Prior Trustee's demand.

"12.

"On or about October 4, 1994, the Prior Trustee requested the Mazes enter into a promissory note for the prior $50,000 balance, plus interest to date. The Prior Trustee affirmed that the amount was not due and owing but led the Mazes to believe the promissory note was necessary for the Trust's accounting needs. The Prior Trustee fully acknowledged that the $75,000 had been paid in full.

"* * * * *

"14.

"The Mazes failed to receive the $52,958.66 set forth in the promissory note of October 4, 1994. Therefore, the Mazes are not obligated to pay any amount as set forth in the promissory note."

Plaintiff moved for summary judgment. In support of that motion, plaintiff submitted factual materials establishing that: (1) On July 30, 1993, defendants borrowed $75,000 from the Trust and, consequently, executed a $75,000 promissory note in the Trust's favor on August 5, 1993. (2) On February 18, 1994, defendants paid a check to the Trust in the amount of $27,773.95, representing a payment of $25,000 against the principal of the August 5, 1993, note and $2,773.95 of interest due on that note through January 3, 1994. (3) On January 3, 1994, defendants executed a new promissory note in amount of $50,000, which, in plaintiff's view "replaced," and represented the principal balance still due and owing, on the August 5, 1993, note. Defendants made no payment on that note. (4) On October 4, 1994, defendants executed a promissory note in the amount of $52,958.65, representing the $50,000 principal of the January 3 note, plus accrued interest on that note. Defendants made no payment on the October 4, 1994, note.

In responding, defendants proffered factual materials that corroborated, and expanded on, the allegations of their answer that, at the direction of the prior trustee, Hiliary Turner, they had, in fact, fully paid the original $75,000 note through two checks. One check was the February 18, 1994, check for $27,773.95 made payable to the Trust.

The other check, for $50,000, was made payable to Keerin Systems, a company in which Turner, the trustee, held an ownership interest and to which Turner had "loaned" at least $500,000 of the Trust's assets. According to defendants, they made the Keerin payment because they trusted Turner and, after they tendered the check, Turner assured them that they were "free and clear" on the $75,000 note.

Defendants also proffered evidence concerning their execution of the January 3, 1994, note for $50,000 and their subsequent execution of the "updated" October 4, 1994, note for $52,958.66. Defendants' brief summarizes the substance of that evidence as follows:

> "Some time later, Mr. Turner approached the Mazes with a new promissory note for $50,000. Turner explained that not everything had gone right with the Dillinger Trust/Keerin Systems loan, and he and Ross Fearey, the attorney for the Dillinger Trust, needed the Mazes to sign the note. Mr. Maze responded that he had already paid the money back. Mr. Turner replied by stating he knew the money had been repaid by the Mazes, but he needed the promissory note so he could cover himself with the estate. The Mazes signed the new note for $50,000 even though they had completely repaid the obligation, for two reasons. First, they trusted Mr. Turner. Second, because Mr. Turner was trustee of the Dillinger Trust and the trust had loaned over $500,000 to ISSPRO, Inc. ('ISSPRO'), the company where Mr. Maze served as president. Mr. Turner previously allowed ISSPRO to make interest payments which were less than required, and ISSPRO was not then capable of paying the accumulated interest if Mr. Turner demanded it at that time.

> "Later the Mazes signed another promissory note at the request of Mr. Turner for $52,958.66 replacing the $50,000 note referenced in the previous paragraph, and including interest for the nine (9) month period since the signing of the $50,000 note."

Thus, that evidence, if believed, showed that the note at issue here was, in fact, a sham entered into so that Turner could "cover himself with the estate."[1]

---

[1] In an excerpt of his deposition, which defendants proffered, defendant Dennis Maze testified:

Plaintiff replied, asserting that the parol evidence rule, ORS 41.740, precluded consideration of evidence that defendants and the former trustee had agreed that the $50,000 check to Keerin was a payment against the $75,000 note and that the subsequent notes were shams. Plaintiff contended that, because the October 4, 1994, note was fully integrated and unambiguous, evidence of the alleged oral agreements was inadmissible. At oral argument on the summary judgment motion, defendants apparently disputed the applicability of the parol evidence rule, invoking, *inter alia*, *Pendleton Grain Growers v. Pedro*, 271 Or 24, 530 P2d 85 (1975).[2] The court allowed summary judgment:

"The court, having considered [the parties' legal and factual submissions], and considering Defendants' reliance on *Pendleton Grain Growers v. Pedro* * * * finds that Plaintiff is entitled to judgment because as a matter of law, ORS 41.470 (the parol evidence rule) prohibits the introduction of any evidence raised by the Defendants in their memoranda."

On appeal, defendants contend that the trial court erred in its application of the parol evidence rule and that, if the excluded evidence had been considered, then it would have presented material issues of fact precluding summary judgment. Plaintiff counters that defendants' answer did not adequately raise a question as to the validity of the October 4, 1994, note and that, in all events, the parol evidence rule barred consideration of evidence that that note was a "sham."

■ Plaintiff's first argument is quickly dispatched. In *Pendleton Grain Growers*, the court rejected the plaintiff's argument that "the invalidity of a contract must be raised by affirmative defense," concluding that "defendant may introduce evidence to controvert the existence of such a contract under a general denial." 271 Or at 28. Here, defendants' answer, while admitting the execution of the October 4, 1994, note, completely and uniformly denied all allegations as to

---

"And Hiliary had said that the deal with Keerin hadn't gone just exactly right but the money was going to come, but he and Ross [the Trust's former attorney] needed for us to sign this note for this thing. * * * He says, I know you paid the money back to the estate, but I need to do this to make sure that everything is covered and I'm covered."

[2] The hearing on the summary judgment motion was not recorded. However, the court's order allowing summary judgment recites defendants' reliance on *Pendleton Grain Growers*.

the enforceability of the note and liability under the note.[3] Because that answer was the functional equivalent of the general denial in *Pendleton Grain Growers*, it afforded a basis for defendants to contest the validity of the note.

■ Plaintiff's second argument—that the parol evidence rule bars consideration of evidence that a fully integrated, unambiguous writing was a sham—is much more difficult. That is so because that issue implicates irreconcilable decisions of the Oregon Supreme Court. *Compare Carolina Casualty v. Oregon Auto.*, 242 Or 407, 408 P2d 198 (1966); *Mock v. Bell Motors, Inc.*, 234 Or 224, 380 P2d 992 (1963); and *Kergil v. Cen. Ore. Fir Supply*, 213 Or 186, 323 P2d 947 (1958) (all holding that evidence that an ostensibly fully integrated writing is a "sham" designed to mislead third parties is not admissible under the parol evidence rule) *with Story v. Hamaker*, 245 Or 584, 423 P2d 185 (1967) (holding that such evidence is admissible under the parol evidence rule). *Cf. Pendleton Grain Growers*, 271 Or at 28 (quoting *Story* with approval in somewhat different context). Although *Story* was "last in time"—and, indeed, was decided the year after *Carolina Casualty*—it does not cite, much less expressly overrule, the other directly conflicting cases. Moreover, although *Kergil* and *Carolina Casualty* gave comprehensive consideration to the issue, the treatment in *Story* was somewhat summary. Nevertheless, as explained below, we resolve the conundrum by adhering to *Story*. Consequently, the trial court erred in declining to consider defendants' extrinsic evidence and, as a consequence, in granting summary judgment.

In *Kergil*, the plaintiff brought an action to enforce a written truck lease by which the plaintiff had leased its trucks to the defendant, a lumber company, to haul defendant's lumber. The defendant introduced evidence that the lease was a sham entered into for the purpose of evading federal transportation taxes that the plaintiff would be obligated to pay if it transported the defendant's lumber as a common carrier. The defendant asserted that the "real contract" was an oral agreement by which the plaintiff had agreed to haul the defendant's lumber for a price. The trial

[3] *See* 161 Or App at 443-44.

court admitted that evidence, over the plaintiff's parol evidence objection, and the jury returned a defense verdict. The Supreme Court reversed:

> "Thus, the principle question is: Will the law permit consideration of oral evidence denying the validity of the written memorial of the parties when such oral evidence shows the written document was executed for the purpose of defrauding or misleading a third party?
>
> "The courts are not of a single mind upon this issue. We confess, the majority of jurisdictions at the present time, based upon pure logic, admit the evidence on the basis that such testimony is offered, not to vary the terms of the written instrument within the letter of the parole [*sic*] evidence rule, but only to show the parties never intended the written instrument to be a binding agreement.
>
> "The difficulty with this view is that it overlooks the moral aspects of the situation. It permits the law to be used to lend its aid to those who would mislead or defraud third parties without providing any restraining penalty * * *."
> 213 Or at 189.

After canvassing a range of authority, including *Wigmore on Evidence*,[4] the court adhered to the minority view as "the one most in conformity with the dictates of justice." 213 Or at 191.

In *Mock*, the plaintiff sought specific performance of a written agreement by which it was to purchase the defendant's auto dealership. The defendant attempted to offer evidence that the writing was a sham designed to mislead the Ford Motor Company into acquiescing in the sale and that the sale was actually governed by an oral agreement that included materially different terms. The trial court, citing

---

[4] The court quoted with approval the following observation:

"When the document is to serve the purpose of a mere *sham*, this principle in strictness exonerates the makers. But a just policy would seem to concede this only when the pretense is a morally justifiable one (as, to calm a lunatic or to console a dying person). When it is *morally beyond sanction*, or aims at an *evasion of the law* or a deception of other persons, by intention of the parties, that intention will not be given effect. Hence, if the *validity* of the instrument would give effect to such intention (as in usury), the instrument will not be enforced; but if the *invalidity* of the instrument would give effect to such intention, the instrument will be enforced. 9 *Wigmore on Evidence* 16, § 2406." *Kergil*, 213 Or at 190 (emphasis in original).

*Kergil*, refused to consider the defendant's parol evidence and enforced the written agreement. The Supreme Court affirmed without further discussion. 234 Or at 225.

Finally, in *Carolina Casualty*, one of the issues pertaining to the availability of insurance coverage, and a consequent claim for contribution, involved the enforceability of a written truck lease. Under that lease, as in *Kergil*, the ostensible lessor, a trucking company, agreed to lease its trucks to the "lessee," a lumber company, on an individual trip basis. An accident occurred, and an insurer for the lumber company asserted that it had no coverage obligation because the lease was a sham to avoid Interstate Commerce Commission regulations and that, consequently, the truck and its driver were actually within the trucking company's control. The trial court admitted parol evidence concerning the "sham" nature of the written lease and ultimately concluded that the truck and driver were not within the lumber company's control, and, consequently, that the insurer had no coverage or contribution obligation.

The Supreme Court reversed:

"Actually, the evidence admitted by the trial court did not tend to vary or contradict the contract in question. It sought to prove that the writing was no contract at all. The weight of authority elsewhere is that parol evidence is admissible to prove this even as between the parties to the contract. * * * It is admissible, according to the weight of authority, even though the contract is entered into for the purpose of deceiving a third party for the accomplishment of a morally objectionable purpose. * * *

"We have been unable to find any Oregon decisions discussing the law where there is no morally reprehensible purpose to be accomplished by a writing not intended to have legal effect. However, Oregon does not follow the weight of authority where the purpose sought to be accomplished by such a writing is morally objectionable. We follow the minority rule which says that where a written contract was entered into to accomplish a morally objectionable purpose, parol evidence that the writing was a sham will not be received. Otherwise, a court is used to aid those who would mislead or defraud third parties.

*Kergil v. Central Ore. Fir Supply * * *; Mock v. Bell Motors, Inc. * * *.*

"* * * * *

"There is a distinction between this case and *Kergil* and *Mock*. In this case the original litigation was between a party to the contract [the lumber company] and third parties [the accident victims], while in the Oregon cases cited the litigation was between the parties to the contract. This is a factual distinction which would not affect the proper application of the *Kergil* principle. The purpose of the *Kergil* rule is to act as a deterrent to sham contracts entered into with a morally objectionable intent to mislead third parties. The refusal to allow evidence that the contract is a sham is justified to a greater extent in this case than in *Kergil*. When the rule is applied in litigation between the parties, as in *Kergil*, the effect is that the other party to the contract—who is equally culpable—gets the benefit of having the written contract enforced. This is not so, as in the present case, where the litigation is with innocent third parties." 242 Or at 414, 416-17 (citations omitted; footnotes omitted).

*Carolina Casualty* was decided in January 1966. In February 1967, *Story v. Hamaker* issued. In *Story*, the plaintiffs brought an action to recover a $10,000 down payment that they had allegedly made pursuant to a land sale contract to purchase a ranch from the defendant's decedent. The defendant attempted to avoid the contract while relying on the testimony of a realtor that the plaintiffs had not, in fact, made the down payment and that the land sale contract was entered into as part of a scheme to deceive the State Department of Veterans' Affairs. The trial court ultimately relied on that testimony in concluding that the land sale contract was not "the result of a meeting of the minds of the parties," that "it was not the intention of the parties" that the decedent sell the ranch to the plaintiffs, and that no consideration supported the land sale contract. 245 Or at 586-87.

The Supreme Court affirmed. The court's parol evidence discussion read, in its entirety, as follows:

"Plaintiffs contend that the realtor's testimony upon which the court's decision appears primarily to have been based was inadmissible under ORS 41.740, the parol-evidence

rule. The statute itself provides that the bar against the admission of parol evidence to vary a writing is not applicable 'where the validity of the agreement is the fact in dispute.' This is the fact in dispute here." *Story*, 245 Or at 586.

No Oregon decision after *Carolina Casualty* has cited with approval the pertinent discussions of the *Kergil/Carolina Casualty* line of cases. The only subsequent decision to quote *Story*'s substantive discussion with approval is *Pendleton Grain Growers*. 271 Or at 29. That case, however, did not involve assertions that the written agreement was a sham designed to mislead third parties. Rather, the parol evidence issue in *Pendleton Grain Growers* went to the enforceability of an ostensibly fully integrated grain sales contract, where the defendant asserted that he had signed that agreement in blank without agreeing to the price and place of delivery terms and that the plaintiff had subsequently, without the defendant's consent, filled in those terms. 271 Or at 26-27. The Supreme Court concluded that the trial court erred in excluding the evidence of the plaintiff's alleged manipulation because that evidence, if believed, would establish that there was "no contract."[5] 271 Or at 29.

■ Here, as in *Kergil, Mock, Carolina Casualty*, and *Story*, defendants' proffered evidence demonstrated that an apparently fully integrated writing was a sham designed to mislead third parties, *viz*, the trust beneficiaries. We are unable to discern any material distinction among those cases—except for their outcome—and, as noted, the latter does not refer to the former. Thus, our disposition depends on whether we adhere to the *Kergil / Carolina Casualty* line or to *Story*. We conclude that *Story*'s analysis is ultimately more persuasive.

We adhere to *Story* because only in that case was the court's analysis expressly based on the text of ORS 41.740, rendering its result the better referent for the "rule of prior construction." *See, e.g., Stephens v. Bohlman*, 314 Or 344, 350

---

[5] *Cf. Bonded Credit Co. v. Hendrix*, 282 Or 35, 38-39, 576 P2d 795 (1978) (holding that *Pendleton Grain Growers* was inapposite where "the validity of the agreement" was not "the fact in dispute").

n 6, 838 P2d 600 (1992) ("When this court interprets a statute, that interpretation becomes a part of the statute as if written into it at the time of its enactment.").

ORS 41.740 provides:

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except where a mistake or imperfection of the writing is put in issue by the pleadings or where the validity of the agreement is the fact in dispute. However this section does not exclude other evidence of the circumstances under which the agreement was made, or to which it relates, as defined in ORS 42.220, or to explain an ambiguity, intrinsic or extrinsic, or to establish illegality or fraud. The term 'agreement' includes deeds and wills as well as contracts between parties."

Evidence that a written agreement is invalid as a sham would seem to fall within the express terms of the statutory exception for "where the validity of the agreement is the fact in dispute." Nevertheless, in *Kergil, Mock,* and *Carolina Casualty*, the court reached the contrary conclusion without referring to the express statutory language.[6] Indeed, *Kergil* and *Carolina Casualty* each include only a single unadorned citation to ORS 41.740, without any acknowledgment of the statutory text. *Mock* does not even cite the statute. In contrast, the discussion in *Story*, while brief, is expressly predicated upon the statutory text: "[W]here the validity of the agreement is the fact in dispute." 245 Or at 586.

In sum, *Story* is later in time, is based on the statutory language, and, unlike *Kergil, Mock,* and *Carolina Casualty*, reaches a result that is consonant with the statutory language. If we were deciding this case as a matter of first impression, there is no question that, whatever the equitable concerns underlying *Kergil et al*, we would reach the result in *Story* as comporting with the analysis prescribed by *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143

---

[6] The statutory exception has existed in substantively identical form since 1862. General Laws of Oregon, ch 8, § 682, p 319-20 (Deady 1845-1864).

(1993). Given that analysis, we believe that the Supreme Court, if faced with the choice between *Kergil et al* and *Story*, would opt for the latter. Accordingly, we do the same.

The trial court thus erred in refusing to consider defendants' evidence in opposition to summary judgment. Plaintiff contends that, even if the court had considered that evidence, it was so innately incredible that it could not present a triable issue of material fact. Plaintiff is wrong: A reasonable factfinder could draw different inferences, including inferences of credibility, from the parties' evidence. Defendants' evidence raises precisely the sorts of conflicts and issues that are not susceptible to summary judgment.

Reversed and remanded.